UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MANUEL VASQUEZ, et al.,

                Plaintiff-Petitioners,

    vs.

TONY RACKAUCKAS, et al.,

          Defendants-
          Respondents.

CASE NO.  SACV 09-1090 VBF(RNBx)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW AFTER
COURT TRIAL**

///

///

///

13793623.1

After presiding over the bench trial, considering the evidence and counsel's arguments, and reading the parties' post-trial briefs, this court rendered its Statement of Tentative Decision after Court Trial and made an accompanying order regarding preparation of proposed Findings of Fact and Conclusions of Law. L.R. 52-2 - 52-8. The Statement of Tentative Decision was made after an eleven day court trial on the Plaintiffs' Complaint for Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus. (Dkts. 1-3). After further considering the evidence and the parties' documents filed in response to the Court's Tentative Decision (Dkts. 396-404), the Court hereby makes its Findings of Fact and Conclusions of Law after Court Trial.

Pursuant to grounds shown by the Plaintiffs as set forth herein, the Court finds for the Plaintiffs and against the Defendants on the First Claim against each Defendant (42 U.S.C. Section 1983 - Procedural Due Process Under U.S. Const. Amend. XIV) and the Second Claim against each Defendant (Procedural Due Process Under Cal. Const. Art. I, Section 7). The Plaintiffs prevail in their challenge to the Defendants' action of enforcing the gang injunction against Plaintiffs after the OCDA dismissed them from the state court suit prior to judgment. Procedural due process required a pre-deprivation hearing in the circumstances presented in this case. The remedies sought by Plaintiffs of declaratory relief and injunctive relief are granted as addressed below. On the other hand, the writ of habeas is denied in that the Plaintiffs have not shown that any of them are in "custody" for purposes of a writ of habeas corpus.

There have been substantial changes since this court denied the Plaintiffs' Motion for Preliminary Injunction. These changes justify a Judgment in favor of the Plaintiffs. First, the Court has now had the benefit of a lengthy trial and live testimony and therefore is in a better position to not only judge the weight of the evidence but also its credibility. As set forth below, the Court finds that the weight of the evidence and the law favors the Plaintiffs.

1   Additionally, the equitable relief sought by the Plaintiffs has more support,

2   including evidentiary support presented at trial.  The injunctive relief sought has

3   been clarified and narrowed.  The declaratory and injunctive relief is not

4   inappropriate, unworkable or an affront to comity or an impairment of sovereign

5   powers or dignity of the State of California.  **This Court is not instructing the**

6   **state court as to the nature of any hearing.**  This action and the Court's order are

7   directed to the Defendants, and not the state court.  As set forth below, the

8   Defendants are barred from enforcement of the State's Order for Permanent

9   Injunction against the Plaintiffs.

10                          **Findings of Fact**

11  **The Parties to this Action**

12  1.      The Plaintiff-Petitioners Manuel Vasquez, Miguel Lara, and Gabriel Bastida

13  bring this action individually on behalf of a class certified as:

15          All persons named as individual defendants in *People v. Orange
            Varrio Cypress Criminal Street Gang, et al.*, Orange County
            Superior Court, 30-2009 00118739, dated February 17, 2009,
16          who appeared in the Orange County Superior Court to defend
            themselves and were voluntarily dismissed by the Orange
17          County District Attorney's office, and who did not have
            contempt proceedings pending against them arising out of the
18          Order for Permanent Injunction against "Orange Varrio Cypress
            Criminal Street Gang" dated May 14, 2009, as of the date of the
19          filing of this litigation - September 23, 2009.  Dkt. 135.

20  2.      Additionally, Plaintiff Randy Bastida brings this action individually and on

21  behalf of a class certified as:

23          All juveniles named as individual defendants in People v. Orange Varrio
            Cypress Criminal Street Gang, et al., Orange County Superior Court, 30-
24          2009 00118739, dated February 17, 2009, for whom no guardian ad litem
            was appointed, who were voluntarily dismissed by the Orange County
25          District Attorney's office, and who did not have contempt proceedings
            pending against them arising out of the Order for Permanent Injunction
26          against "Orange Varrio Cypress Criminal Street Gang" dated May 14,
            2009, as of the date of the filing of this litigation - September 23, 2009.
27          Dkt. 135.

3.     The Defendants are Tony Rackauckas, the Orange County District Attorney ("OCDA") and Robert Gustafson, Chief of the Orange Police Department ("OPD").The Defendants are sued only in their official capacities.  Compl. ¶ 1.

**The Complaint in this Federal Action**

4.     On September 23, 2009, the Plaintiffs Manuel Vasquez, Miguel Lara, Gabriel Bastida, and Randy Bastida, on their own behalf and on behalf of Class Plaintiffs (collectively "Plaintiffs") filed their Complaint for Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus against the Defendants.  The Complaint has two causes of action for procedural due process violations: the first is a 42 U.S.C. Section 1983 claim under the 14th Amendment of the U.S. Constitution, and the second is a claim under the California Constitution, Art. I, section 7. Compl. ¶¶ 97-103.

5.     The Plaintiffs seek to enjoin Defendants and their directors, officers, agents and employees from enforcing the terms of the permanent injunction order against them issued in *People v. Orange Varrio Cypress Criminal Street Gang, et al.*, Orange County Superior Court, 30-2009 00118739 and those similarly situated "without first providing them with a full constitutionally-adequate hearing."  Compl. Prayer for Relief; Plaintiffs' Closing Brief (dkt. 376), page 50 and Reply Brief (dkt. 387), page 26.

6.     Plaintiffs challenge Defendants' tactics in subjecting them to a gang injunction, obtained via default against the gang to which they allegedly belong, after dismissing the Plaintiffs from that suit. Compl. ¶ 4.

7.     On September 29, 2009, the Court denied the Plaintiffs' Ex Parte Application for a Temporary Restraining Order, but set an Order to Show Cause re Preliminary Injunction hearing for November 5, 2009.  Dkt. 45. On November 17, 2009, the Court denied Plaintiffs' Motion for Preliminary Injunction.  Dkt. 86.  On September 27, 2010, the Court denied the parties' cross motions for summary judgment.  Dkt. 213.

## The State Court Action

8.     On February 17, 2009, the OCDA, on behalf of The People of the State of California, filed in the Superior Court of California for the County of Orange ("OCSC"), a Complaint for Preliminary and Permanent Injunction to Abate a Public Nuisance. *People v. Orange Varrio Cypress Criminal Street Gang, et al.*, Orange County Superior Court, 30-2009-00118739 (hereinafter, the "State Action"). 11/16 a.m. RT 17:5-14, 64:21-65:5; *see also* Trial Ex.126.[1]

9.     In the State Action, the OCDA sued not only the Orange Varrio Cypress Criminal Street Gang ("OVC") as an unincorporated association but also 115 individuals and 150 Does alleged to be active members or associates of OVC. Trial Ex. 126.

10.    On February 23, 2009, the OCDA filed an ex parte application to serve OVC under California Civil Procedure Code § 416.40(c). Trial Ex. 274. The OCDA requested and obtained permission to serve the gang via a named defendant, Patrick DeHerrera, whom the OCDA alleged was an OVC member. Trial Ex. 275.

11.    On or about February 24 and 25, 2009, OPD officers served the summons, complaint, and supporting papers totaling at least 500 pages on numerous individuals named in the state court complaint, including Plaintiffs. 11/16 a.m. RT 78:9-20; *see also* 11/9 a.m. RT 6:5-10.

12.    Ultimately, 32 defendants (adults and represented juveniles) – including Plaintiffs Lara, Vasquez, and Gabriel Bastida – filed an answer, general denial, or otherwise formally appeared in response to the complaint. Trial Exs. 68, 80, 174; Pls.' RJN Ex. 3 at Dkt. Nos. 63 & 207; Pls.' RJN Exs. 25 through 46,

---

[1] The facts found in this section have not materially changed from the facts found in the Court's ruling on Plaintiffs' Motion For Preliminary Injunction (dkt. 86), and are supported by the evidence introduced at trial and through Plaintiffs' Request For Judicial Notice (*see* dkt. 329, 372).

114, 53, 101 through 104.

13. On May 12, 2009, the OCDA filed a request for dismissal against 62 individual defendants in the State Action. This group included the 32 individuals who responded to the complaint either by filing a general denial and/or an answer and approximately 27 unrepresented juveniles. The dismissal was entered by the Clerk of the OCSC on May 12, 2009. 11/16 p.m. RT 39:3-23; Trial Ex. 17.

14. On May 14, 2009, the OCSC granted the OCDA's request for default and judgment against OVC and those individual defendants who had not filed a response to the complaint and had default entered against them. *See* Trial Ex. 267. The OCSC then signed the Order for Permanent Injunction (the "Order"). Trial Ex. 19.

15. The Order states that it applies to OVC and to all OVC's "members, participants, agents, associates, servants, employees, aiders, and abettors whose membership, participation, agency, association, service, employment, aid or abetment is more than nominal, passive, inactive, or purely technical and all persons acting under, in concert with, for the benefit of, at the direction of, or in association with the OVC criminal street gang in any manner that is more than nominal, passive, inactive, or purely technical." The terms of the Order applied to a limited gang operation area in the City of Orange, which the state court termed the "Safety Zone." Trial Ex. 19.

16. In early June 2009, the OCDA, by and through the OPD, began to serve the Order for Permanent Injunction. 11/16 p.m. RT 46:6-8. As of September 3, 2009, 98 individuals were served with the Order for Permanent Injunction, including at least 48 individuals who had been named in the litigation against OVC and its members but were voluntarily dismissed by the OCDA. 11/16 p.m. RT 46:15-47:8; *compare* Trial Ex. 17 *with* Trial Ex. 78; *see also* 11/23 a.m. RT 55:21-57:13.

17. Along with the Order for Permanent Injunction, the OCDA and OPD

served a notice stating:

> YOU ARE HEREBY PUT ON NOTICE THAT ON MAY 14, 2009, JUDGE KAZUHARU MAKINO SIGNED AN ORDER FOR PERMANENT INJUNCTION AGAINST THE ORANGE VARRIO CYPRESS CRIMINAL STREET GANG.
>
> ALL MEMBERS OF THE GANG ARE SUBJECT TO THE TERMS OF THE PERMANENT INJUNCTION.
>
> ALL MEMBERS OF THE GANG, WHETHER OR NOT NAMED IN THE ORIGINAL LAWSUIT OR NAMED IN THE ORIGINAL LAWSUIT AND LATER DISMISSED FROM THE LAWSUIT . . . . ARE SUBJECT TO THE TERMS OF THE PERMANENT GANG INJUNCTION.
> . . .
> **ALL PERSONS DESCRIBED ABOVE WILL FACE CRIMINAL PROSECUTION**
>
> **PURSUANT TO PENAL CODE SECTION 166(a)(4) FOR ANY WILLFUL VIOLATION OF ANY PROVISION LISTED IN THE PERMANENT GANG INJUNCTION.**

Trial Ex. 8; 11/16 p.m. RT 47:9-48:5. The OCDA did not submit the notice to the OCSC for approval before the notice was served with the permanent order. 11/16 p.m. RT 48:6-9.

18. On July 10, 2009, the OCSC granted Plaintiff Gabriel Bastida's request to vacate the default entered against him and to be permitted to contest the allegations against him. Trial Ex. 205; *see also* Trial Ex. 204; 11/9 a.m. RT 26:13-15. On May 12, 2009, the OCDA had sought and obtained entry of default against Mr. Bastida. Trial Ex. 267; *see also* 11/9 a.m. RT 23:7-14. On May 15, 2009, Gabriel Bastida had filed a request to vacate the default (Trial Ex. 204) and a general denial (Trial Ex. 174), requesting that he be allowed to present a defense at trial and contest the allegations against him.

19. On July 16, 2009, the OCDA dismissed without prejudice the case against Gabriel Bastida. Trial Ex. 70; *see also* 11/9 a.m. RT 28:17-21.

20. On August 13, 2009, Defendant OPD served Gabriel Bastida with the

1  Order.  Trial Ex. 78; *see also* 11/9 a.m. RT 30:9-13.

2  **Specific Findings After Bench Trial in the Federal Court**

3  21.   The evidence presented at trial established that the factors set forth in

4  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) weigh clearly in favor of the

5  Plaintiffs. The evidence showed that Plaintiffs' private interest was strong, as

6  the Order restricts some of their most basic liberties. Plaintiffs were not given

7  pre-deprivation hearings before Defendants subjected them to the Order,

8  especially in light of the dismissals requested by the Defendants. (See e.g.

9  Anderson trial testimony 11/24 a.m. RT 34:20-51:23, 83:16-84:24 (regarding

10  decision to dismiss)).  In sum, their constitutional rights were violated.

11      a.   Procedural due process requires a pre-deprivation hearing in the

12  circumstances of this case especially where the class of individuals deprived of

13  rights is vaguely defined and difficult-to-discern, where the prohibited conduct is

14  indefinite or unclear, and where the Defendants' imposition of the Order on

15  Plaintiffs interferes with the Plaintiffs' ability to engage in common day-to-day

16  lawful activities. (Trial testimony Aaron Drootin, RT 11/19; trial testimony of Dr.

17  Malcolm Klein).

18      b.   The Order on its face implicates Plaintiffs' liberty interests, including

19  the following provisions: "Do Not Associate",[2] "Curfew" (barring Plaintiffs from

20  being out in public, in public view, or any place accessible to the public between

21  the hours of 10 p.m. and 5 a.m., with limited exceptions for activities including

22  school, work, religious activities, or paid entertainment), "Stay Away From

23  Alcohol" (barring Plaintiffs from consuming, possessing or being in the presence

24

_____

25  [2]  The "Do Not Associate" provision prohibits Plaintiffs, "in any public place, any
place accessible to the public, or in public view," from standing, sitting, walking,

26  driving, bicycling, gathering or appearing with anyone named as a defendant in the
State Action, or anyone they know to be a "member, participant, agent associate,

27  servant, employee, aider, or abettor of" OVC, or anyone they know to be "acting
under, in concert with, for the benefit of, at the direction of, or in association with"

28  OVC.  Trial Exh. 19 at 10.

of an open container of alcohol, in any place in public or accessible to the public), "Do Not Intimidate" (barring "confront[ing]", "annoy[ing]..." provok[ing] anyone in any public place...."), "Do Not Wear Gang Clothing" (prohibiting wearing the words or color orange). See Trial Ex. 19 at 10, 13, 14-16. As the Plaintiffs show, the Order implicates Plaintiffs' fundamental rights, including rights of free movement, free speech and associational rights. (Pls. Closing Brief, Dkt. 376, pg. 10-13 and trial evidence cited page 13:9-22). Plaintiffs' trial testimony provides examples that further illustrate the deprivation of liberties:

    i.    Plaintiff Manuel Vasquez, who has lived his entire life in the Safety Zone, has curtailed going to parks, stores, restaurants, and the mall, for fear of being arrested for violating the association clause of the Order. (11/10 a.m. RT 25:23-26:5, 27:3-12, 28:6-29:11.) Mr. Vasquez testified that he no longer goes anywhere in the injunction area with his brother, with whom he lives and who has also been served with the Order. (11/10 a.m. RT 28:18-29:5.)

    ii.    Plaintiff Miguel Lara no longer goes with his family to their favorite restaurants, to the local pool where Mr. Lara learned to swim, to parks where the family previously picnicked, or to the City of Orange's annual street fair. (11/10 p.m. RT 53:19-55:9, 56:8-19; 11/23 a.m. RT 55:21-57:13.) Mr. Lara also participated in vigils, demonstrations, and protests within the injunction area, but ceased doing so after being served with the Order, for fear he would be violating its terms by confronting and challenging government policies and associating with individuals on the injunction list. (11/10 p.m. RT 42:17-43:12, 47:16-48:14, 49:18-20, 50:5-15.) Such persons include Mr. Lara's twin brother, who also has been served with the Order.

iii.    Plaintiffs Gabriel and Randy Bastida, brothers who have both been served with the Order, do not drive through the injunction area together or visit family together, or attend family functions that are held outdoors, for fear of violating the Order. (11/9 a.m. RT 4:5-5:13, 36:24-37:13; *see also* 11/9 a.m. RT 33:16-34:1.) When their grandfather had a stroke and was taken to a hospital in the Safety Zone in the middle of the night, their mother was forced to decide whether to permit the brothers to visit the publicly accessible hospital, an act that would violate both the curfew and association provisions of the Order. (11/9 p.m. RT 8:3-9:10.) The Bastidas also refrained from participating in protests, at the behest of their mother, out of fear of violating the Order's "Do Not Associate" provision. (11/9 p.m. RT 6:9-7:10.)

c.    On November 30, 2010, the Court toured the Safety Zone by car on a route that took well over an hour. The Safety Zone covers an area of approximately 3.78 square miles, or about sixteen percent of the City of Orange. (11/16 a.m. RT 45:9-46:8; *see also* Pls.' RJN Ex. 2.) The Safety Zone covers various types of neighborhoods, including the following: dense residential areas; several schools and the Friendly Center; at least four parks (Hart, El Camino, Killefer, and Sycamore); the Chapman University campus and its surroundings; the historic downtown Orange area around "the Circle," which includes a vibrant commercial district; government buildings and offices (including Orange City Hall, the police station, and the public library); a hospital; and several busy commercial areas, including long commercial strips along Tustin Avenue, Chapman Avenue, Main Street, and Batavia Street, which include small independent businesses, large chain stores and a mall. This area encompasses hundreds of retail and commercial businesses, and hundreds of homes and apartments. (11/16 a.m. RT 45:9-46:5; 11/9 a.m. RT 34:2-36:15; Trial Exs. 355 & 355A; *see* also RJN Ex.2.) Application of the Order's

terms in this area, particularly as against individuals who have spent much of their lives living in and around the area, imposes significant restrictions on Plaintiffs' liberty interests.

      d.    Defendants' admitted policy is to arrest, transport and book those Plaintiffs alleged to have violated the Order and hold them pending bond or arraignment, rather than citing and releasing them. (11/18 a.m. RT 8:18-9:20; Trial Ex. 6 at 26). Defendants also have a policy of seeking increased bail amounts for violations of the Order. (11/18 a.m. RT 10:10-22; Trial Ex. 6 at 28, 33.)

      e.    Deprived of discovery and a hearing by OCDA's voluntary dismissal, the Plaintiffs were not given notice of and access to evidence, or the opportunity to confront and to be heard as required by due process. (11/16 p.m. RT 66:21-67:23; 11/16 a.m. RT 70:11-13; 11/17 p.m. RT 24:8-14; 11/18 p.m. RT 36:25-37:10; 11/9 a.m. RT 8:16-9:7;11/16 a.m. RT 78:21-79:8). Nor were the Plaintiffs given the right to have a neutral decision-maker decide whether they were active participants in OVC.

      f.    In this case, post-deprivation hearings cannot cure the lack of process. Intervention in the State Action, post-arrest contempt proceedings and the "removal" procedure are not adequate post- deprivation remedies in this case.

22.    The risk of erroneous deprivation is substantial.

      a.    Defendants served the Order on individuals they determined to be "active participants" of OVC causing a nuisance in the Safety Zone. (11/16 p.m. RT 45:16-23; 11/23 a.m. RT 55:21-57:13; 11/18 a.m. RT 25:5-9, 26:6-21.) The term "active participant" of a criminal street gang is defined in the penal code and case law as a person who participates in, or acts in concert with a criminal street gang in more than a nominal, passive, inactive, or purely technical way. (11/16 a.m. RT 33:17-21; *see People v. Englebrecht,* 88

Cal.App.4th 1236, 1261 (2001).) The OPD tracked who had been served with the Order. (11/17 p.m. RT 83:4-6.) Once an individual had been served with the Order, Defendants could arrest and prosecute the individual for a violation of the Order's terms. (11/18 a.m. RT 10:1-4; Trial Exh. 6 at 26; 11/18 a.m. RT 18:2-19:5; Trial Ex. 32 at 019.; 11/23 a.m. RT at 25:21-26:6.))

   b.   In determining which individuals were active participants of OVC and should be served with the Order, the Defendants undertook a unilateral, fact-intensive determination, based on one-sided and untested evidence and requiring judgmental questions not determined by objective measures. (Trial testimony of DDA Hernandez and Det. Nigro; 11/17 p.m. RT 57:25-58:11; 11/18 a.m. RT 39:3-6; trial testimony of Aaron Drootin, 11/19 p.m.; and Plaintiffs' Closing Brief, Dkt. 376, pages 17 - 20). The Court bases this determination on the following findings:

       i.   Defendants repeatedly testified that they did not use a mathematical formula and had no fixed list or set criteria to determine whether an individual was an active participant of OVC. Instead, Defendants testified that whether or not someone was an active participant of OVC was a fact-intensive, case-by-case determination based on a wide variety of information and factors. (11/17 p.m. RT 57:25-58:11 (Det. Nigro testifying that there is no "equation" to determine gang membership); 11/16 a.m. RT 39:19-21(Mr. Hernandez's assessment of whether or not an individual is an active participant of OVC was fact specific, case-by-case); 11/16 a.m. RT 37:15-18 (Mr. Hernandez looked at a lot of factors); 11/16 a.m. RT 39:5-11 (Mr. Hernandez had no objective criteria); 11/17 p.m. RT 55:7-11 (Det. Nigro made a case-by-case determination for each individual based on any and all factual information available to him); 11/17 p.m. RT 56:19-21 (Det. Nigro did not have a fixed list of

criteria); 11/24 a.m. RT 58:8-19, 89:6-14 (Assistant District Attorney John Anderson testifying that determination of gang participation was made on "totality of the circumstances," that there was no "bright line rule").)  For example, Detective Nigro testified that there were "many, many different ways that somebody could participate in OVC," so that there was no list of activities that equaled active participation, and that membership in OVC is "different for different people," such that "every situation can be different."  (See 11/17 p.m. RT 53:23-54:4, 54:21-55:5, 61:22-25.)

ii.     Defendants evaluated the information provided to them based on subjective impressions as gang police and prosecutors, rather than clear standards or specific, objective measures. (11/17 p.m. RT 56:22-57:1 (Det. Nigro used his "knowledge [and] experience[,] guided by the law" to determine active participation); 11/16 a.m. RT 42:10-17 (whether an individual was an active participant of OVC was based on Hernandez's experience as a prosecutor).  Such a determination, which is not "susceptible of reasonably precise measurement by external standards," poses a high risk of error and requires greater procedural protections.  *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989); *see infra*, Concl. Law ¶10(b). For example, OPD Officer Aaron Drootin testified that, although he had submitted a sworn declaration in the State Action attesting that individuals were "known OVC gang participants," he had no basis for this statement, that such a determination was outside his expertise as a patrol officer, and that he had no opinion on how to determine gang membership or participation. (11/19 p.m. RT 39:3-40:12.) Defendants' reliance on factors such as association with gang members, spending time in a gang area, "admissions," or examples of criminal conduct does not provide clear

standards or measures because of the significant ambiguity and range of conduct encompassed in these factors. *See, e.g.,* 11/19 p.m. RT 32:10-33:7 (OPD Officer Drootin admitting that a person knowing people from OVC does not indicate gang membership); 11/19 p.m. RT 64:4-66:4) (Dr. Klein testifying that "admissions" vary; 11/19 p.m. RT 33:14-34:12 (Drootin testifying consumption of drugs or alcohol not gang-related activities); 11/19 p.m. RT 66:17-67:1 (Dr. Klein testifying that drug and alcohol crimes "not at all" valuable to determining gang membership because crimes very common among non-gang members); (11/19 p.m. RT 29:14-24 (despite describing admission of gang membership in declaration, officer had no recollection of individual's statement); *compare* 11/19 a.m. RT 34:11-23 (Det. Nigro stating that non-gang member could have friends or family that are gang members); 11/19 p.m. RT 60:21-61:5 (Dr. Klein testifying same); *with* 11/19 a.m. RT 9:16-20, 34:7-9, 35:10-23 (Det. Nigro stating association was in his view sufficient to establish gang participation).

    iii.    In making a determination as to who was an active participant of OVC, Defendants considered voluminous records from varied sources, including police reports, field interview cards, STEP notices, and photographs. (11/17 p.m. RT 45:22-46:9, 46:19-48:1; 11/16/10 a.m. RT 37:11-14.) The documents, taken together, totaled thousands of pages. (11/18 a.m. RT 62:10-21; see Trial Ex. 818 (collected packets).) Defendants also relied on information outside these documents to reach their conclusions, including undocumented interviews and information from confidential informants, citizen informants, members of the community, and other gang participants, as well as the personal knowledge and observations of members of OCDA and OPD. (11/17 p.m. RT 50:24-51:3; 11/18 p.m. RT 36:25-38:6.)

iv.　In determining who was an active participant of OVC,
Defendants made credibility determinations of the type typically
reserved for Courts and/or juries.  Det. Nigro testified that some of the
documentation he reviewed contained explicit denials of membership
in OVC by Plaintiffs, but he did not "give th[ose] statement[s] much
weight." (11/19 a.m. RT 47:4-17.)

c.　As Plaintiffs' assert in their closing memorandum (Dkt. 376) and as
the evidence presented at trial showed, determining whether an individual is an
active participant of a criminal street gang is a multi-factored, complex and fact
specific determination.

i.　The testimony of plaintiffs' experts established that gangs in
general are "informal" groups — groups without explicit structures
such as constitutions, bylaws, or appointed or elected officers.  (11/17
p.m. RT 60:3-4; 11/19 p.m. RT 55:17-25.)  As such, gangs – and OVC
in particular – lack formalities that might provide objective and easily
verifiable ways of establishing membership, such as rosters, or dues-
paying lists, lists of employees, or employment schedules.  (11/19 p.m.
RT 55:21-56:12; *see also* RT 11/10 p.m. 3:17-24.) Deciding who is a
member or participant of OVC thus requires judgment rather than
simply confirming objective criteria. (11/19 p.m. RT 56:9-12.)  In other
words, there is an absence of clear, objective criteria for determining
whether a person is an active gang participant.

ii.　The testimony of plaintiffs' experts established that joining a
gang is often a "fluid process" in which there is not always a clear
point at which a person becomes a member or participant of a gang.
(11/19 p.m. RT 62:10-63:8; 11/17 p.m. RT 61:12-21.)  Both Dr. Klein
and Prof. Vigil testified that while gangs sometimes have rites for
entering a gang, those individuals who have grown up in the local

neighborhood or who have family members in the gang may be deemed members of the gang without undergoing any kind of initiation. (11/10 a.m. RT at 114:12-115:1; 11/19 p.m. RT 62:10-24.) This lack of clear, objective criteria for initiation into a gang further complicates the determination of who is an "active participant."

iii.     The testimony of plaintiffs' experts established that a person's gang participation often changes over time. Plaintiffs' experts testified that gang members often leave the gang as they age. (11/10 a.m. RT at 113:18-114:5 (Vigil); 11/19 p.m. RT 62:7-12 (Klein)), with median gang tenure lasting from about a year to as long as three to five years, depending on the type of gang. (11/19 p.m. RT 61:6-21.) Dr. Klein testified that people frequently move in and out of gangs, which makes it difficult to determine membership or participation at any single point in time. (11/19 p.m. RT 58:8-10.)

iv.     The testimony of plaintiffs' experts demonstrated that gang membership may be particularly difficult to determine in longstanding, territorial gangs based around a neighborhood, because gang members and nonmembers often grow up together in the same neighborhood and have social relationships and friendships unrelated to the gang. (11/19 p.m. RT 60:7-14 (Dr. Klein testifying about conflation between gang and family and neighborhood).) For example, plaintiffs put on evidence that individuals use the term "OVC" to refer to the historical Cypress Street Barrio located within the Safety Zone, and thus use of the term "OVC" may not be an indication of gang membership. (11/19 a.m. RT 69:9-70:25; see also 11/23 a.m. RT 4:9-19), which is often identified by the same name, "OVC" (11/23 a.m. RT 11:1-14, 12:7-14.)

d.     The trial testimony shows that additional procedural protections –

1  such as access to evidence, discovery, and cross-examination – would significantly

2  reduce the risk of error in such a fact-intensive, vaguely defined determination as

3  who is an active gang participant, in particular by helping to distinguish between

4  the parties' subjective judgments and objective facts.  (See 11/19 p.m. RT 29:6-13,

5  39:3-7, 40:2-12, 71:23-72:16; Trial Ex. 26.) For example, Det. Nigro testified that

6  his determination that one Plaintiff was a gang participant relied in part on field

7  interview cards where an officer had checked a box indicating that the subject was

8  "flying colors/gang attire," although Det. Nigro admitted that he did not see the

9  clothing and did not know why the officer had checked the box. (11/18 p.m. RT

10  44:9-17 (Trial Ex. 800 at 12); 11/19 a.m. RT 39:16-19, 40:8-11, 41:14-23.) As

11  another example, Det. Nigro testified that he relied in part on reports of admissions

12  from other officers on field interview cards, where a box marked "admission" was

13  checked, even though he did not know what question had been asked or what

14  response was given that caused the officer to check the box. (11/19 a.m. RT 43:14-

15  20, 44:18-45:3.)

16  23.   The government has no legitimate interest in failing to provide a pre-

17  deprivation hearing.

18      a.   Although the OCDA and OPD have a strong interest in protecting

19  the community against criminal activity and in an fiscally sound manner, the

20  relevant inquiry for the *Mathews* analysis is not into the government's interest

21  generally, but rather into the government's interest "in providing (or not

22  providing) specific procedures." *Haygood v. Younger*, 769 F.2d 1350, 1355-1358

23  (9th Cir. 1985). Here, the government has no interest in failing to provide a pre-

24  deprivation hearing.  As Assistant District Attorney Anderson recognized,

25  holding an evidentiary hearing before someone is subjected to a gang injunction

26  promotes important government interests, and that allowing only post-

27  deprivation remedies creates "a huge problem." 11/24 a.m. RT 101:11-102:2; *see*

28  *Haygood*, 769 F.2d at 1357.

FINDINGS OF FACT & CONCLUSIONS OF LAW-CASE NO. SACV-09-1090 VBF(RNBx)

b.      Defendants do not show the existence of an administrative, fiscal or other substantial burdens in providing additional pre- deprivation safeguards. They do not, for example, show that a pre-deprivation hearing would cause more expense or delay than post- deprivation proceedings.

c.      Defendants did not show that a need for prompt action justified a lack of due process.

i.      By May 2009, when the OCDA dismissed Plaintiffs from the State Action, the OCDA had already obtained preliminary injunctions against OVC as an entity and nearly eighty seven individuals. (Tr. Ex. 80 at 2; Tr. Ex. 82.) Thus, to the extent that Defendants had any interest in the prompt imposition of a gang injunction, that interest had been met through these preliminary injunction orders.

ii.      Defendants introduced the testimony of Dr. Jeffrey Grogger, an economist, who testified that gang injunctions reduce violent crime, on average, by five to ten percent a year in the first year after they are introduced, but that measurable statistically significant reductions occur only in assaults, rather than other crimes, and only for the first year after injunction are introduced. 11/23 p.m. RT 18:3-22; 12:16-16:4. Plaintiffs' expert, Dr. Klein, testified that there were conflicting studies as to the effectiveness of gang injunctions in reducing crime. 11/19 p.m. RT 77:7-79:17. The ultimate effectiveness of gang injunctions, however, is not relevant to whether a hearing should be required before subjecting a person to one. Dr. Grogger testified that he had no opinion on whether providing a hearing before subjecting somebody to an injunction would make a gang injunction more or less effective. 11/23 p.m. RT 23:18-21.

24.    In sum, the Defendants failed to provide adequate due process. Claimed post-deprivation remedies do not cure the lack of process and are in any event

inadequate. Additional safeguards are required in this case, particularly some kind of hearing - notice and the opportunity to be heard - before the State deprives a person of liberty.

a. As the Plaintiffs set forth, intervention in the State Action is not an adequate remedy for the lack of pre-deprivation hearing. First, the nature and even the very possibility of intervention as a post-deprivation remedy is speculative: Plaintiffs would have to move for intervention in the state court--a motion that could be denied. *See* Cal. Code Civ. Proc. § 387. No statute or case law establishes that plaintiffs would be entitled to intervene as a matter of right, and no clear procedures exist to guide how such intervention would take place or what procedural safeguards might be provided to plaintiffs. *See* 11/17 a.m. RT 7:2-16. Second, even if plaintiffs were successful in intervening in the State Action, Defendants provided no indication of how long the process of obtaining procedural protections such as discovery and an evidentiary hearing could take-- factors that would be significant because, in Defendants' view, Plaintiffs would remain subject to the Order until the State Court ruled to the contrary. Finally, even assuming the adult Plaintiffs could intervene pro per, the class of juvenile Plaintiffs, who cannot represent themselves in Court or have their parents represent them without a guardian ad litem, have no ability to intervene in the State Action. 11/24 a.m. RT 35:4-37:22; 11/17 a.m. RT 33:12-18, 34:2-21; CAL. CIV. CODE § 372; CAL. FAM. CODE § 6601 *see also* Trial Exs. 80, 82 (illustrating that many of the minors were unrepresented).

b. As the Plaintiffs set forth, post-arrest contempt proceedings are an inadequate remedy. (Plaintiffs' Closing, pages 38 - 40.) In order to avail themselves of a contempt hearing, Plaintiffs would first have to violate the Order's terms, thereby subjecting themselves to arrest, jail, significant bail payments, and a potential sentence of up to six months in jail and a $1,000 fine. 11/18 a.m. RT 8:18-9:20, 10:10-22; Trial Ex. 6 at 26, 28, 33; *see also*

Cal. Penal Code § 166(a)(4).) Moreover, even if the individual plaintiff was found not guilty of contempt, this finding would not preclude Defendants from arresting that Plaintiff for any subsequent alleged violation of the Order.

   c. The Defendants' proposed "removal" procedure is not adequate. First, the precise nature of the process and the potential relief it offers remain unclear. Defendants admitted that the only written information that exists concerning the procedure is the single-page document that was served on named defendants at the outset of the State Action. (Trial Ex. 16; 11/16 p.m. RT 70:24- 71:7.) Defendants also admitted that the process described in this document had never been implemented with regard to OVC or any of the five other injunctions the OCDA had obtained. (11/16 p.m. RT 73:4-7.) The one individual that Defendants stated had taken advantage of the "removal" procedure appeared to negotiate an informal agreement under which the Defendants voluntarily agreed not to enforce the Order against him, without use of the "removal" procedure. (11/16 p.m. RT 76:9-16, 77:16-21.) Moreover, even if the "removal" process operates as set forth in the one-page document, it falls short of providing adequate process in several respects. The petition for removal is adjudicated not by a neutral decision-maker, but by a "panel of two Senior Deputy District Attorneys" and "a representative from the Probation Department" – in other words, a majority of the Panel is composed of representatives of the entity (OCDA) that made the decision to subject the individual to the injunction in the first place. (Trial Ex. 16.) There is no provision for discovery, and the burden is placed on the petitioning individual to demonstrate that he or she is not and has never been an active participant in the gang. (See Trial Ex. 16.) Neither does the procedure provide for any right to appeal the decision of the three-person panel. In short, this process strips away many of the critical components of due process, including an adversarial hearing before a neutral decision-maker,

1    prior notice of the evidence, the ability to confront witnesses, and the

2    heightened standard of proof.

3         d.    The weight of the evidence also shows that the Defendants

4    violated Plaintiffs' due process rights under the California Constitution.  *See*

5    *People v. Ramirez*, 25 Cal. 3d 260, 268 (1979).  In examining when procedural

6    safeguards are required under the California Constitution, California courts

7    apply the *Mathews* balancing inquiry with the addition of a fourth factor: the

8    dignitary interest in informing individuals of the nature, grounds, and

9    consequences of the action and in enabling them to present their side of the

10   story before a responsible governmental official. *Id.* at 269; *Ryan v. Cal.*

11   *Interscholastic Fed'n*, 94 Cal. App. 4th 1048, 1071-72 (2001).  This dignitary

12   interest encompasses the appearance of fairness to those involved. *See People*

13   *v. Hernandez,* 160 Cal. App. 3d 725, 747-48 (1984).  Here, the decisions about

14   whom to subject to the injunction's restrictions are made unilaterally and

15   without notice or opportunity to be heard, by the same police and prosecutors

16   whose thresholds for enforcement and prosecution are made significantly

17   lower by the injunction.  The appearance of fairness factor under the California

18   constitution weighs further in favor of Plaintiffs.

19   25.   The evidence proves that OPD and OCDA are liable individually on

20   counts one and two of the Complaint and that they are also are liable as co-

21   conspirators.  Contrary to the arguments made in the OPD brief, (Dkt. 373),

22   the elements of conspiracy as well as individual liability have been met. *See*

23   *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) ("To

24   establish liability for a conspiracy in a § 1983 case, a plaintiff must

25   demonstrate the existence of an agreement or meeting of the minds to violate

26   constitutional rights.") (internal quotation marks and citation omitted); *see*,

27   *e.g.*, cross-examination of Nigro 11/16 p.m. and Hernandez 11/16 a.m; *see also*

28   testimony of Anderson, 11/24 a.m. regarding the OCDA working with the

OPD re the injunction.

a. The testimony of DDA Hernandez and Det. Nigro shows that OPD and OCDA explicitly agreed to collaborate in seeking a gang injunction against OVC and enforcing that injunction against Plaintiffs.

    i. Det. Nigro and DDA Hernandez testified that OPD worked collaboratively with the OCDA office to provide documentation that they requested for the State Action. (11/17 p.m. RT 43:15-24; 45:22-47:4; 47:14-48:1; 70:22-71:13; 11/16 a.m. RT 29:6-30:24.) Throughout this process, OPD and OCDA were in close contact as to exactly what was needed for the State Action. (11/17 p.m. RT 41:2-10.)

    ii. At the time OCDA sought to dismiss Plaintiffs from the State Action, OPD and OCDA specifically discussed whether the injunction could be enforced against individuals who had been dismissed. (11/17 p.m. RT 81:3-83:4; 11/18 a.m. RT 47:12-48:2.)

    iii. Even beyond its role in obtaining the underlying order, OPD played an active and necessary role in enforcing the Order against Plaintiffs. It was primarily OPD who identified new individuals who should be served with the permanent Order against OVC. (11/18 a.m. RT 22:1-4.) Det. Nigro's testimony establishes that for each individual who was dismissed from the State action but subsequently served with the Order, OPD gathered and reviewed his or her documentation and submitted it to OCDA as a recommendation that the individual be served with the Order. (11/18 a.m. RT 26:6-14, 30:12-18.)

    iv. OPD makes the threshold decision about enforcement of the Order. Individual OPD officers retain discretion whether to effect an arrest for a violation of the Injunction; OPD officers do not have to consult OCDA before they make an arrest for a violation of the Order. (11/18

a.m. RT 32:21-33:3.)

b. Further, the weight of the evidence shows that the constitutional violations were the result of a "municipal policy or custom" of the OPD. Detective Nigro testified as to the policies established by OPD (in some instances independently, and in others after consultation with the OCDA) for subjecting the Plaintiffs to the Order. (Plaintiffs' Reply, page 24 n. 19; *e.g.,* 11/17 p.m. RT 83:4-21, 83:24-84:1, 84:8-13; 11/18 a.m. RT 4:20-23, 5:2-15, 8:18-9:20, 19:1-5, 22:1-4, 22:5-24, 25:5-9, 26:6-21, 27:5-12, 28:17-29:8, 29:19-30:4, 30:12-31:1, 32:21-33:3.)

## Conclusions of Law

1. As an initial matter, there is federal question subject matter over the Plaintiffs' Section 1983 claim and supplemental jurisdiction over their state constitutional claim.

2. Plaintiffs do not have to exhaust to pursue their Section 1983 claims. *See Patsy v. Bd. of Regents*, 457 U.S. 496, 507 (1982); *see also Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).

3. The Plaintiffs do not provide sufficient support for their argument that the service of the state court permanent injunction order places them in custody for purposes a writ of habeas corpus. Plaintiffs' habeas corpus claims fails as it is not sufficiently supported.

4. The *Rooker-Feldman* doctrine does not apply in this case. The doctrine is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus.Corp.*, 544 U.S. 280, 284 (2005). The Plaintiffs did not lose in state court, but rather were dismissed by the Defendants and no adverse judgment was entered against them. Additionally, the Plaintiffs do not ask the Court to review and reject the state court judgment; they ask the Court to prevent

its enforcement. *Maldonado v. Harris*, 370 F.3d 945, 950 (9th Cir. 2004).

5.    The Anti-Injunction Act, 28 U.S.C. Section 2283, does not apply in this case because Section 1983 claims are authorized exceptions to this Act. *See Mitchum v. Foster*, 407 U.S. 225 (1972).

6.    The abstention doctrine established by *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) does not apply in this case because there is no ongoing state proceeding that is parallel to this federal case.

7.    The Court also finds that the *Younger* abstention doctrine does not bar this action. The requirements for *Younger* abstention are not met. There is no on-going state-initiated proceeding and the federal court action here would not enjoin the state court proceeding or have the practical effect of doing so. In other words, this federal action would not interfere with the state proceeding in a way that *Younger* disapproves. *Green v. City of Tucson*, 255 F.3d 1086 (9th Cir. 2001); *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1147 (9th Cir. 2007) (citing *Younger v. Harris*, 401 U.S. 37, 41 (1971)).

    a.    Because the Plaintiffs are not parties to the state court's injunction, it is not the equivalent of a pending state court action for purposes of *Younger*. *See Gottfried v. Medical Planning Servs., Inc.*, 142 F.3d 326, 329 (6th Cir. 1998).

8.    There is no reason that the application of injunctions to non-parties should be categorically exempted from due process scrutiny.  In certain circumstances, due process prevents injunctions from being entered against non-parties without a prior hearing on whether they are acting in concert or participation with the defendants. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969).   Here, Defendants' enforcement of the Order against Plaintiffs based on their purported status as gang members is akin to Defendants attempting to treat Plaintiffs as if they were named in

the Order.

9.    *People ex rel. Totten v. Colonia Chiques*, 156 Cal. App. 4th 31 (2007), *People ex Rel. Gallo v. Acuna*, 14 Cal. 4th 1090 (1997), and *People v. Englebrecht*, 88 Cal. App. 4th 1236 (2001) are inapposite. None of these cases, nor the federal cases on which they rely, addresses whether a Court should apply a *Mathews*- type analysis to claims such as those brought by Plaintiffs here, and none of these cases holds that a *Mathews*-type analysis would result in a decision in favor of defendants if presented with an injunction similar to the Order at issue here.

10.    The inquiry pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), including the evidence presented at trial, provides solid support for the equitable relief sought by the Plaintiffs.

     a.    By subjecting Plaintiffs to the Order, Defendants have imposed a significant restraint on their liberties. *See supra*, Finding of Fact ¶¶ 21b, c, d; *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (the "liberty" protected by the Due Process Clause "extends to the full range of conduct which the individual is free to pursue"); *Raich v. Gonzales*, 500 F.3d 850, 862 (9th Cir. 2007); *People v. Englebrecht*, 88 Cal. App. 4th 1236, 1255-1256 (2001) (noting that because a gang injunction restricts lawful, commonplace activity, it is an extraordinary remedy and holding that it must be proven by clear and convincing evidence).

     b.    Defendants determination as to who was an "active participant" was fact-intensive, based on one-sided and untested evidence and requiring judgmental questions not determined by objective measures. A determination such as this one that is not "susceptible of reasonably precise measurement by external standards" poses a high risk of error (*see* Findings of Fact ¶¶ 21a, 22) of the sort that weighs strongly in favor of higher procedural protections. *Chalkboard*, 902 F.2d at 1381; *see also Connecticut v. Doehr, 501 U.S. 1, 8 (1991); cf. Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 609 (1974) (no hearing necessary for issue involving "ordinarily

1   uncomplicated matters that lend themselves to documentary proof").

2       c.      The Defendants' unilateral determination lacked the procedural

3   protections that characterize due process and would lessen the risk of error, such as:

4           i. Notice of and access to evidence, *Mathews*, 424 U.S. at 345-46;

5               *American-Arab Anti-Discrim. Comm. v. Reno*, 70 F.3d 1045, 1069 (9th

6               Cir. 1995);

7           ii. Opportunity to confront witnesses, *American-Arab Anti-Discrim.*

8               *Comm.*, 70 F.3d at 1069;

9           iii. A neutral decision-maker. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533

10              (2004; *Concrete Pipe & Products of Cal., Inc. v. Construction*

11              *Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 617 (1993); Doe v.

12              *Gallinot*, 657 F.2d 1017, 1024 (9th Cir. 1981); cf. Prieto- Romero v.

13              Clark, 534 F.3d 1053 1065-66 (9th Cir. 2008).

14      d.      The government has no legitimate interest in refusing to provide a pre-

15  deprivation hearing. *See* Finding of Fact ¶ 23. *Haygood*, 769 F.2d at 1356.

16  11.     The Plaintiffs met their burden of showing entitlement to injunctive relief,

17  demonstrating (1) that they have suffered irreparable injury; (2) that remedies,

18  available at law are inadequate; (3) that the balance of hardships between

19  Plaintiffs and Defendants warrant a remedy in equity; (4) and that the public

20  interest would not be disserved by a permanent injunction. *eBay Inc. v.*

21  *MercExchange*, LLC, 547 U.S. 388, 392 (2006); Fed. R. Civ. P., Rule 65.

**Declaratory Relief Order**

23  As to the First Claim and Second Claim against the Defendants, the court enters

24  judgment in the Plaintiffs' favor and declares that by subjecting Plaintiffs and

25  those similarly situated, or causing them to be subjected, to the enforcement of

26  the Order, Defendants deprived the Plaintiffs and those similarly situated of their

27  constitutionally protected liberty or property interests without adequate

28  procedural protections.

**Permanent Injunction Order**

For the reasons set forth above, the court issues an injunction barring Defendants from enforcing the Order against the Plaintiffs.

Dated:  5-10-11

_Valerie Baker Fairbank_
Hon. Valerie Baker Fairbank
United States District Judge